FILED'08 JUN 05 15:18USDC·ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHERYLE L. FLETCHER,                                    Civ. No. 07-429-AC

                   Plaintiff,                   FINDINGS AND
                                                        RECOMMENDATION

      v.

COMMISSIONER OF SOCIAL
SECURITY,

                   Defendant.

---

ACOSTA, Magistrate Judge:

        Plaintiff Cheryle L. Fletcher ("Plaintiff") seeks judicial review of a final decision of the

Findings & Recommendation                    1                              {KPR}

Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"). This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g) (2008). Following a careful review of the record, the court concludes that the decision of the Commissioner is supported by substantial evidence, contains no errors of law, and should be affirmed.

*Administrative History*

Plaintiff filed an application for DIB on October 10, 2002, alleging an inability to work beginning September 6, 2000. The application was denied initially and on reconsideration. Plaintiff requested a hearing, which was held before an Administrative Law Judge ("ALJ") on January 13, 2005. Tr. 17. Plaintiff, who was represented by counsel, appeared and testified. A vocational expert ("VE") and a medical expert ("ME") also testified at the hearing. *Id.* On April 22, 2005, the ALJ issued a decision denying the application. Tr. 17-26. This decision became final on January 22, 2007, when the Appeals Council denied review. Tr. 6-8; *see* 20 C.F.R. §§ 416.1481, 422.210.

*Standard of Review*

This court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *see also Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993). The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusion." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld if it is a rational interpretation of the evidence, even if there are other possible rational interpretations. *See Magallanes v. Bowen*,

881 F.2d 747, 750 (9th Cir. 1989); *see also Andrews*, 53 F.3d at 1039-40.

*Summary of the ALJ's Findings*

The ALJ engaged in the five-step "sequential evaluation" process when he evaluated Plaintiff's disability, as required. *See* C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At step one, the ALJ concluded that Plaintiff had not engaged in any substantial gainful activity since the onset of her alleged disability. Tr. 18. At step two, the ALJ considered whether Plaintiff suffered from "a severe medically determinable physical or mental impairment." *Bowen*, 482 U.S. at 140. Here, the ALJ stated that "[t]here [was] insufficient evidence in the record to find that the vision problems, anxiety, panic attacks, ulcers, psychosis, and shoulder pain alleged by [Plaintiff] are medically determinable." Tr. 18.

The ALJ also discounted diagnoses by an examining physician, Dr. Goldman, and an examining clinician at Cascadia Behavioral Healthcare, Richard Beanes, that Plaintiff suffered from "paranoid schizophrenia" because both primarily "relied on claimant's self report." Tr. 19. The ALJ's finding was bolstered by a report by Richard Howell, Doctor of Osteopathy, who "[found] that [Plaintiff] did not meet the diagnostic criteria for schizophrenia, and even suggested that [Plaintiff] was reporting hallucinations in order to continue receiving Klonopin for non-therapeutic reasons." *Id.* Additional psychological evaluations in 2000 and 2002 also gave "no [indication] of psychosis or diagnoses of schizophrenia." *Id.*

The ALJ found that other of Plaintiff's impairments were not severe. First, Plaintiff had been diagnosed as having wrist problems, including tendonitis and carpal tunnel syndrome. However, the ALJ noted that Plaintiff had neither complied with her treatment nor sought surgery as an examining physician recommended, and concluded that these impairments were not severe. Plaintiff also made

Findings & Recommendation 3 {KPR}

"numerous complaints of nausea, vomiting, abdominal pain, diarrhea, and urinary incontinence with no evidence of a specific diagnosis." Tr. 19. Accordingly, the ALJ concluded that these, as well as the claim of tendonitis, "do not significantly limit her physical or mental ability to do basic work activities and are not severe." *Id.*

Plaintiff has also been diagnosed with various forms of hepatitis. Even so, after her 1998 diagnosis, Dr. Jones "ascertained that her liver function remained normal and opined that she was not a candidate for further treatment." *Id.* In 2002, Dr. Durbin examined Plaintiff and referred her to a gastroenterologist for further treatment, but there is no evidence that Plaintiff ever saw the specialist. On February 10, 2003, Dr. Durbin informed Plaintiff "that she had tested positive for hepatitis A, B and C .... He further noted that she had no signs of active disease." Tr. 20. Plaintiff was also diagnosed with lung damage and bronchial asthma. *Id.*

Since 2000, Plaintiff has been diagnosed with various mental disorders, including "an adjustment disorder with depressed mood, borderline intellectual functioning, antisocial personality traits, and heroin dependence in indeterminate remission," as well as "chronic depression." *Id.* (internal quotation marks omitted.) After complaining of blackouts in July 2002, Plaintiff was prescribed Dilantin. In 2003, Plaintiff reported that she had not had a seizure in two-and-one-half years, in hopes of getting her "driving privileges reinstated." *Id.* In addition, Plaintiff has complained of "headaches, vision problems and dizzy spells," and has a long history of abusing cocaine and heroin. *Id.*

The ALJ recognized the following ailments as "severe," within the meaning of the Act: "seizure disorder, asthma, hepatitis C, headaches, borderline intellectual functioning, depression, and polysubstance abuse." *Id.* However, at step three, the ALJ concluded that these impairments were

Findings & Recommendation                    4                    {KPR}

not severe enough to meet or equal any of the listings set forth in Appendix 1, Subpart P, Regulations No. 4. Specifically, Plaintiff's severe impairments to not satisfy the following listings: Section 3.03, Asthma; Section 5.05, Chronic liver disease; Section 11.03, Epilepsy – nonconvulsive; 12.02, Organic Mental Disorders; and 12.04, Affective Disorders.

Next, the ALJ determined Plaintiff's residual functional capacity ("RFC"). In doing so, the ALJ must consider all Plaintiff's symptoms, to the extent that they are consistent with objective medical evidence. Here, the ALJ determined that Plaintiff's "allegations as to the existence of her symptoms are only partially supported by the medical record." Tr. 21. The ALJ also found that Plaintiff's "allegations as to the intensity, persistence and limiting effects of these symptoms [were] disproportionate and not supported by the objective medical findings or any other corroborating evidence." Tr. 22. He concluded that Plaintiff was not credible, chiefly due to "the fact that throughout the record and at the hearing she [had] provided incomplete, inconsistent and conflicting information, particularly with regard to her drug use." *Id.* For this reason, the ALJ did not rely on Plaintiff's representations as to the extent and intensity of her symptoms.

The ALJ then evaluated "any medical opinions, which are statements from acceptable medical sources, which reflect judgments about the nature and severity of the impairments and resulting limitations." *Id.* The ALJ determined that, except for Dr. Bald, Plaintiff's treating medical sources had not addressed this question. In 1993, Dr. Bald recommended that Plaintiff "return to work in a job requiring less repetitive use of her hands." *Id.* The ALJ also credited the results of a medical consultation performed for the Social Security Agency on March 19, 2003, which "conclud[ed] that [Plaintiff] retained the [RFC] to perform medium work, avoiding even moderate exposure to hazardous conditions or to fumes, smoke, dust, etc." *Id.*

Findings & Recommendation                    5                    {KPR}

The ALJ then addressed evidence of Plaintiff's global assessment of functioning ("GAF"). In 2000, Dr. Bryan gave Plaintiff a GAF score of 50, but noted that within the last year she had scored 65 on this scale. On June 4, 2002, Dr. Sacks gave Plaintiff a GAF score of 51, and stated that Plaintiff "could return to work if she were prescribed a non-addictive anticonvulsant medication." Tr. 23. A psychological evaluation performed on December 16, 2002, revealed that "[Plaintiff] retained the mental [RFC] to perform simple, routine, repetitive work not requiring contact with the general public." *Id.* The ALJ concluded that these consultants' findings were "consistent with the clinical record and accurately describe the functional impact of the medically determinable impairments upon the claimant." *Id.*

The ALJ defined Plaintiff's RFC as follows:

> [Plaintiff] retains the [RFC] to perform simple, routine, repetitive light to medium work. However, she must avoid even moderate exposure to fumes, dust, smoke, etc., or any exposure to hazardous conditions. Furthermore, she is limited to only infrequent to occasional contact with the general public. Finally, the claimant has no other functional or environmental limitations.

Tr. 25.

At step four, the ALJ presented the vocational expert ("VE") with a hypothetical detailing Plaintiff's condition and asked whether this person would be capable of performing Plaintiff's past relevant work. The VE "testified that this person could no longer perform her past relevant work." Tr. 24. Accordingly, the ALJ determined that, based on her RFC, Plaintiff was not capable of performing past relevant work. *Id.*

At step five, "the burden shift[ed] to the Social Security Administration to show that there are other jobs existing in significant numbers in the national economy that the claimant can perform, consistent with her [RFC], age, education and work experience." Tr. 24. The VE found that, based

on Plaintiff's specific abilities, she is capable of performing light unskilled work. *Id.* The VE gave

the following examples: electronics worker, small products assembler, or laundry folder. Tr. 25.

The ALJ concluded that Plaintiff "[was] capable of making a successful adjustment to work that

exists in significant numbers in the national economy[,]" and was, therefore, not disabled. *Id.*

*Discussion*

Plaintiff argues that the ALJ erred on the following seven grounds: (1) the ALJ failed to take

Plaintiff's I.Q. scores into account when he found she did not meet the listing for Mental

Retardation, 12.05C; (2) the ALJ improperly ignored lay witness testimony; (3) the ALJ erroneously

concluded that Plaintiff did not meet Listing 11.03; (4) the ALJ did not properly formulate Plaintiff's

RFC; (5) the ALJ's hypothetical did not take all of Plaintiff's limitations into account; (6) the VE's

testimony lacked foundation and the ALJ erred in relying on it; and (7) the ALJ ignored evidence

that tended to rebut the VE's testimony about the existence of jobs in the regional and national

economies.

1.    Listing 12.05C

To satisfy Listing 12.05C, for Mental Retardation, Plaintiff must demonstrate "[a] valid

verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment

imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404,

Subpt. P, App. 1, 12.05C. "Mental retardation refers to significantly subaverage general intellectual

functioning with deficits in adaptive functioning initially manifested during the developmental

period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." *Id.* at

12.05. Thus, in order to meet the statutory requirement, plaintiff must produce evidence that her

mental retardation manifested itself before the age of twenty-two.

Plaintiff was given an I.Q. test by Dr. Rieckmann and received a score of 70. Tr. 581-82. Plaintiff argues that a person's I.Q. generally does not change over time and, therefore, the court should consider the results of Dr. Reickmann's I.Q. test as dispositive. However, in this case, the evidence suggests that the onset of mental retardation did not occur before Plaintiff reached age twenty-two. The record shows that Plaintiff performed well in school, earned a general equivalency degree ("GED"), and went on to earn an associate's degree at a community college. Tr. 578. Further, there is evidence to suggest that Plaintiff's mental deficiencies may have resulted from an attack, at age forty-one, that left her with headaches, vision problems, and dizzy spells. Tr. 20. Also, Plaintiff's history of substance abuse may have contributed to her changing mental state.

Plaintiff has failed to establish that the onset of her alleged mental retardation occurred before age twenty-two, as Listing 12.05 requires. The only evidence of early onset is Plaintiff's testimony. The Ninth Circuit has consistently held that "questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982); *see also Morgan v. Commissioner of Social Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). When making this determination, "the ALJ may consider, for example: (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid." *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996); *see also Burch v. Barnhart*, 400 F.3d 676 (9th Cir. 2005).

In this case, the ALJ doubted Plaintiff's credibility and rejected her testimony because it was incomplete, inconsistent, and conflicting. Tr. 21. Moreover, the ALJ relied the reports of two examining doctors who stated that Plaintiff may have a tendency to over-report her symptoms. Tr.

Findings & Recommendation                    8                              {KPR}

22, 278, 582. The ALJ articulated specific reasons for rejecting Plaintiff's testimony, as specified above. In light of the evidence presented and the ALJ's conclusion that Plaintiff was not credible, the evidence was insufficient to support a finding that Plaintiff met Listing 12.05C.

2.    Witness statement

Plaintiff argues that the ALJ erred in rejecting lay witness testimony. (Plaintiff's Brief at 12.)    The Ninth Circuit has held that "friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to [the claimant's] condition." *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993). If the ALJ finds the lay testimony not credible, it may be discounted, but only where the ALJ "give[s] reasons that are germane to each witness." *Id.* at 919. The Ninth Circuit "[has] consistently reversed the Commissioner's decisions for failure to comment on such competent testimony." *Stout v. Commissioner*, 454 F.3d 1050, 1056 (9th Cir. 2006). "Indeed, 'lay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment.'" *Id.* at 1053 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996)).

However, it follows that the ALJ need only consider lay witness testimony to the extent that the witness discusses claimant's ability to work. In *Stout*, the judge failed to properly acknowledge the witnesses' statements regarding how the disability impacted the plaintiff's ability to work. In that case, witnesses offered testimony directly commenting on the plaintiff's ability to work and, because one of the witnesses was the plaintiff's direct supervisor, it was clearly relevant. Here, Plaintiff's friend, Anita Mott ("Mott"), completed a questionnaire in which she described one seizure she saw Plaintiff experience. The seizure lasted for approximately twenty minutes and Plaintiff required a full hour to recover from it. Tr. 219-22. Therefore, Mott did not address how the seizures

Findings & Recommendation                    9                    {KPR}

affected Plaintiff's ability to work. Rather, she simply described the symptoms and length of the single seizure.

Although the ALJ did not address Mott's testimony in the written opinion, this is not reversible error. First, the ALJ must consider lay witness testimony, but only to the extent it bears on Plaintiff's ability to work. Mott's testimony did not address this issue or provide observation of the effect, if any, on Plaintiff's work activities. Second, even if this evidence is credited as true, it does not negate the ALJ's disability determination. That Mott witnessed a single seizure does not outweigh the evidence that Plaintiff's seizures are effectively controlled by medication. Third, Mott's testimony is contradicted Plaintiff's representation to her doctor that she had not have a seizure in over two years. Fourth, and finally, it is not clear that the ALJ actually rejected Mott's testimony. Rather, the testimony was not inconsistent with the ALJ's determination that Plaintiff's seizure disorder was effectively controlled by medication.

The medical evidence before the ALJ was that this condition had been treated and was not reoccurring. Even if the lay witness testimony is credited as true, it is not inconsistent with the ALJ's overall determination. For these reasons, the ALJ's treatment of lay witness testimony was adequate and did not amount to reversible error.

3.    Listing 11.03

Plaintiff claims that she suffers from seizures. To meet the requirements of Listing 11.03 for non-convulsive epilepsy, the claimant must produce a "detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of treatment." 20 C.F.R. Pt. 404, Subpt. P, App. 1. However, the record evidence does not demonstrate a severity sufficient to meet Listing 11.03. On January 13, 2003,

Plaintiff told Dr. Durbin that she had not suffered a seizure in over two years. Also, where Plaintiff has reported seizures, she has been prescribed medicine that has reportedly been effective in controlling them. There is no evidence that Plaintiff currently suffers from seizures in a manner sufficient to meet this listing.

Plaintiff argues that, although her seizures alone do not meet Listing 11.03, when coupled with her frequent headaches, they are sufficient to satisfy this listing. For this proposition, Plaintiff cites a SSA Memorandum, reference code S3C81, authored by the Acting Associate Commissioner for Disability on March 29, 1993. The memo states: "migraine headaches can cause an altered level of awareness of self and environment that *could* be equivalent in severity to the alteration of awareness contemplated under Listing 11.03." (Emphasis added.) However, the memo also notes that "[t]here is a significant difference between headaches that cause a primary symptom of pain and true migraine headaches." *Id.* Contrary to Plaintiff's argument, the memorandum in question does not state that a combination of seizures and headaches is sufficient to satisfy Listing 11.03.

The evidence does not demonstrate that Plaintiff suffered from migraine headaches whose severity would disrupt Plaintiff's "awareness and environment" in a manner equivalent to that of a seizure. Although Plaintiff appears to have a long history of headaches, she provides no evidence that they have continued to significantly interfere with her daily activities. In each instance of reported headaches, she was prescribed medicine that effectively controlled them. On January 13, 2003, Plaintiff claimed her headaches had returned because she was forced to stop using Lodine. As a result, the doctor prescribed amitriptyline. Tr. at 706. On January 31, 2003, Plaintiff claimed improvement as a result of the new medicine. Tr. 704. On July 1, 2003, Plaintiff saw Dr. Bernstein and complained of severe headaches. Dr. Bernstein administered and prescribed Imitrex which

Findings & Recommendation                    11                              {KPR}

effectively treated the headaches. Tr. 762. Also, when Plaintiff saw a nurse practitioner in 2004 for

treatment of asthma, she indicated "none" next to "headaches." Tr. 751.

The ALJ correctly analyzed Plaintiff's impairments related to Listing 11.03 and correctly

concluded that Plaintiff does not meet the requirements of this listing.

4. SSR 96-8p

In formulating Plaintiff's RFC, the ALJ found plaintiff capable of performing "simple,

routine, repetitive light to medium work." Tr. 24. Plaintiff argues that this analysis was in error and

failed to meet the requirements of Social Security Ruling 96-8p ("SSR 96-8p"). In particular,

Plaintiff argues that the ALJ failed to take the following impairments into account: seizures,

headaches, fatigue, hepatitis, and deficiencies in concentration, perisitence, and pace.

The ruling, SSR 96-8p, states: "RFC is an assessment of an individual's ability to do

sustained work-related physical and mental activities in a work setting on a regular and continuing

basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work

schedule." It goes on to say, however, that "in assessing RFC, the adjudicator must consider only

limitations and restrictions attributable to medically determinable impairments." Therefore, in

formulating the claimant's specific RFC, the ALJ need not take Plaintiff's every complaint into

account, but rather only those supported by record evidence.

The ALJ prefaces his RFC analysis with a discussion of Plaintiff's credibility. The ALJ

writes: "while the claimant does have severe impairments that could reasonably be expected to

produce some of the symptoms she alleges, her allegations as to the intensity, persistence and

limiting effects of these symptoms are disproportionate and not supported by the objective medical

findings or any other corroborating evidence." Tr. 22. For this reason, the ALJ concluded that he

could not rely on Plaintiff's allegations to inform his RFC analysis. The ALJ analyzed Plaintiff's RFC as follows.

     a.     Seizures

The ALJ relied upon a report from Dr. Durbin that Plaintiff was taking medicine for her condition and had not had a seizure in two-and-one-half years. Tr. 707. The ALJ concluded that Plaintiff's seizures did not require a special instruction to the VE. Despite the fact that there was a friend who claimed to have witnessed Plaintiff having a seizure within that time frame, the seizure was an isolated incident and not medically documented. Due to Plaintiff's failure to provide medical documentation of continuing seizures, the instructions that she avoid exposure to hazardous conditions and general contact with the public were sufficient to accommodate this alleged impairment.

     b.     Headaches

Although Plaintiff's headaches have been medically documented, the record does not disclose whether she continues to suffer from them. Plaintiff's statements as to her symptoms are not sufficient. *See* 42 U.S.C. § 423(d)(5)(A) ("[T]here must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities."). Dr. Durbin reported in 2003 that Plaintiff's headaches had been effectively controlled by the medication Lodine. When Plaintiff was no longer able to use Lodine, however, Dr. Durbin outlined a future medication regimen for Plaintiff. Tr. 706. When Plaintiff saw Dr. Durbin later that month, she reported improvement on the new medication. Tr. 704. On January 17, 2005, Plaintiff filled out a medical questionnaire, indicating that she did not suffer from headaches.

Tr. 751. Taken together, this evidence creates a reasonable basis upon which the ALJ concluded that Plaintiff's headaches would not interfere with her ability to perform regular work.

        c.      Fatigue

The ALJ properly omitted Plaintiff's allegation of fatigue from his RFC determination because the alleged fatigue was not medically documented. An ALJ must provide clear and convincing reasons for discrediting a claimant's testimony regarding the severity of her symptoms. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). Here, the ALJ clearly documented his reasons for finding Plaintiff's testimony not credible. Tr. 21-22. Therefore, Plaintiff's unsubstantiated claims of fatigue were appropriately left out of Plaintiff's RFC.

        d.      Concentration, persistence, and pace

In "paragraph B" of his Psychiatric Review Technique Form, Dr. Wimmers identified deficiencies that Plaintiff experiences in concentration, persistence, and pace. Tr. 467. However, according to SSR 96-8p, "limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." Because these limitations are absent from other medical reports, the ALJ's decision to exclude them from the RFC was not contrary to law.

        e.      Hepatitis

The ALJ addressed the fact that Plaintiff suffers from various types of hepatitis. Tr. 19-20. The record reflects that Plaintiff was diagnosed with hepatitis C, but her "liver function remained normal and . . . she was not a candidate for further treatment." Tr. 19. On February 10, 2003, Plaintiff was again diagnosed with hepatits A, B, and C, but "she had no signs of active disease."

Findings & Recommendation              14              {KPR}

Tr. 20. There is no evidence that Plaintiff's hepatitis is active or impairs her ability to work in any way. Therefore, the ALJ did not ignore Plaintiff's hepatitis, and properly accounted for it in his RFC.

In conclusion, the ALJ adequately incorporated into the RFC all medically determined impairments, both severe and nonsevere, that had medical verification or adequate support in the record. By limiting Plaintiff's exposure to workplace hazards, and the general public, the ALJ addressed any limitations caused by Plaintiff's hepatitis or seizures. The ALJ did not err in formulating Plaintiff's RFC because the conditions that were omitted were not medically determinable from the evidence provided by Plaintiff.

5.      Hypothetical Presented to VE

If a claimant cannot perform past relevant work, the Commissioner must show that the claimant can do other work. Where there is no evidence to establish exactly what work the claimant would be capable of performing, "the Secretary must use a vocational expert to meet that burden. Hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant." *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989) (quoting *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988) (internal quotation marks omitted)).

It is proper for an ALJ to limit a hypothetical to only those restrictions that are supported by substantial evidence in the record. *See Magallanes*, 881 F.2d at 756-57. An ALJ "need not include all claimed impairments in his hypotheticals, [but] he must make specific findings explaining his rationale for disbelieving any of the claimant's subjective complaints not included in the hypothetical." *Light v. Social Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997).

Here, Plaintiff alleges that the ALJ failed to reference her BIF, depression, seizures,

headaches, and inability to do simple math when formulating his hypothetical for the VE. Although

the ALJ did not expressly address Plaintiff's seizures or BIF, his hypothetical to the VE incorporated

limitations created by these conditions. In the absence of any evidence that Plaintiff continued to

suffer seizures regularly, it was appropriate for the ALJ to rely on the report by Dr. Durbin indicating

that Plaintiff's seizures were controlled by medication and that she had not suffered from a seizure

in two-and-one-half years. Tr. 707. An instruction that Plaintiff avoid all workplace hazards

addressed the immediate danger posed by an unexpected seizure during work time.

BIF can vary among individuals and is only a general description of an individual's

intelligence, not ability. By identifying Plaintiff as unable to work with the general public, and

capable of only simple work, the ALJ adequately identified Plaintiff's limitations that result from

BIF. Therefore, the ALJ's hypothetical as to BIF was appropriate.

Despite a medical history of headaches there is no record evidence that Plaintiff still suffers

from them. Tr. 751. Plaintiff's testimony as to her symptoms, without more, is insufficient. *See* 42

U.S.C. § 423(d)(5)(A) ("[T]here must be medical signs and findings, established by medically

acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical

impairment that results from anatomical, physiological, or psychological abnormalities."). Dr.

Durbin noted that Plaintiff's headaches were controlled by medication in the past. Tr. 704-06. In

the absence of any evidence from subsequent doctor visits that these headaches were still a problem,

this was reasonable medical evidence upon which the ALJ relied to exclude Plaintiff's headaches

from the hypothetical. Plaintiff's testimony regarding the continuing effects of these headaches was

disregarded by the ALJ as he did not find her testimony credible.

There is evidence that Plaintiff suffered from depression, especially around the time of her

Findings & Recommendation                    16                         {KPR}

twin brother's death. However, the effect of this depression was not medically determinable. A hypothetical which requires Plaintiff to refrain from interacting with the general public was an appropriate accommodation for depression. The ALJ properly included the impact of Plaintiff's depression, and therefore met his burden of providing a complete hypothetical addressing all of Plaintiff's limitations.

Finally, Plaintiff argues that the ALJ failed to include her inability to do simple math in the hypothetical presented to the VE. However, Plaintiff bears the burden of proving this impairment. The only evidence of Plaintiff's inability to do math was Plaintiff's testimony at the hearing. Tr. 1042. The ALJ made specific findings in support of his conclusion that Plaintiff's testimony was not credible. Tr. 21-22. Further, Plaintiff stated that she earned both a GED and an associate's degree. Tr. 172, 578. These accomplishments are inconsistent with an inability to perform simple math. Therefore, it was reasonable in light of the ALJ's credibility determination to discredit Plaintiff's testimony as to her math ability.

6.   Available Jobs Testimony

Plaintiff argues that the ALJ improperly relied on the VE's testimony because the VE's testimony lacked foundation. However, "[a]n ALJ may take administrative notice of any reliable job information, including information provided by a VE. A VE's recognized expertise provides the necessary foundation for his or her testimony. Thus, no additional foundation is required." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. Or. 2005) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995)). Therefore, as long as the hypothetical posed to the VE contains all of Plaintiff's medically determinable limitations than the ALJ may rely upon the VE's testimony as to the availability of jobs. Further, neither the Federal Rules of Evidence nor a *Daubert* standard apply to

the admission of evidence for administrative hearings in Social Security cases. *Id.* at 1218 n.4

(referencing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)). Accordingly,

the ALJ properly relied on the VE's testimony.

7.    Employment Data from Other Agencies

Plaintiff submitted letters from various government agencies regarding job availability, in

particular those jobs organized by the Dictionary of Occupational Titles ("DOT") codes. The United

States Department of Commerce responded to a letter request from Plaintiff for Census Bureau job

codes. It wrote: "The [DOT] is no longer in use. It was replaced by the Standard Occupational

Classification (SOC) . . . . [W]e do not produce a standard table that shows occupation by whether

the jobs are full-time or part-time." Tr. 375. A letter from the United States Department of Labor,

Bureau of Labor Statistics, stated: "The Bureau of Labor Statistics does not publish data on the

number of jobs by DOT code, at either a national or subnational level." Tr. 371. A letter from the

Oregon Employment Department ("OED") stated: "We do not estimate number of jobs by

individual DOT code." Tr. 372. Instead, the OED "produces occupational employment estimates

and projections (area and statewide) at the Occupational Employment Statistics (OES) code level."

Id.

Plaintiff argued that the ALJ erred by not referencing these submissions. However, the court

is not persuaded that this evidence has probative value. As noted above, the Ninth Circuit recognizes

that a VE's expertise itself establishes a sufficient foundation. *See Bayliss, 427* F.3d at 1218.

Further, this information neither contradicted the VE's testimony, nor has Plaintiff provided any

rebuttal evidence of fewer jobs in the market. Therefore, the ALJ committed no error in omitting

this evidence from his findings.

*CONCLUSION*

Based on the foregoing, the decision of the Commissioner denying Plaintiff's application should be AFFIRMED.

*SCHEDULING ORDER*

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due no later than June 19, 2008. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, any party may file a response within fourteen days after the date the objections are filed. Review of the Findings and Recommendation will go under advisement when the response is due or filed, whichever date is earlier.

DATED this 5th day of June, 2008.

John V. Acosta
United States Magistrate Judge